## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DOUG SMITH, derivatively and on behalf of FIRST NBC BANK HOLDING COMPANY,<br><br>    Plaintiff,<br><br>vs.<br><br>ASHTON J. RYAN, JR., SHIVAN GOVINDAN, JOSEPH F. TOOMY, WILLIAM DAVID AARON JR., WILLIAM M. CARROUCHE, LEANDER J. FOLEY III, JOHN FENNER FRENCH, LEON L. GIORGIO JR., LAWRENCE BLAKE JONES, LOUIS V. LAURICELLA, MARK G. MERLO, CHARLES C. TEAMER SR., and MARY BETH VERDIGETS,<br><br>    Defendants,<br><br>-and-<br><br>FIRST NBC BANK HOLDING COMPANY,<br><br>    Nominal Defendant. | Civil Action No. _____<br><br><br>Jury Trial Demanded |

## SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Doug Smith ("Smith" or "Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant First NBC Bank Holding Company (together with its subsidiaries,

"FNBC" or the "Company") against certain current and/or former officers and directors of the Company, for misconduct from May 10, 2013 to the present (the "Relevant Period"). Plaintiff asserts claims for: (a) violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder; and (b) violations of Louisiana law, including breaches of fiduciary duties, gross mismanagement, insider selling and misappropriation of information, unjust enrichment, corporate waste, and aiding and abetting thereof. Plaintiff makes his allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by FNBC and related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and related non-parties; (c) review of news articles, shareholder communications, and postings on FNBC's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Kinzler v. FNBC Bank Holding Company, et al.*, Civil Action No. 2:16-CV-04243-KDE-JVM (the "Securities Class Action"); and (e) review of other publicly available information concerning FNBC and the Individual Defendants (defined herein).

2

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of FNBC to remedy violations of the federal securities laws and breaches of fiduciary duty under Louisiana law committed by individual directors and officers of the Company.

2.       Under the Individual Defendants' direction, FNBC was transformed from a relationship-centered community bank that purported to be based on sound banking principles into a mini-hedge fund that came to depend for its profitability on ever-increasing investments in risky, tax-leveraged projects.  Unbeknownst to the Company's public shareholders, the Individual Defendants increased FNBC's exposure to federal and state tax-credit investments, which, while increasing the Company's short term net income after taxes, carried with it enormous risks.  These risks included underlying collateral that was illiquid, had to be held for many years, conferred most of their tax benefits very early, and over which the Company had no economic, voting, or managerial control.  The Individual Defendants turned a blind eye to these risks and recklessly failed to control, or to account for, them.

3.      The Individual Defendants' failures to prudently guide FNBC in pursuing the tax-credit investment strategy—and to simultaneously increase the Company's exposure to oil and gas exploration projects without adequate reserves—constituted an abdication of their fiduciary responsibilities.  This misconduct also had the result of misstating and withholding material information from Company shareholders, causing FNBC's stock price to trade at inflated levels, and damaging the Company and its shareholders when the truth was finally revealed, erasing

hundreds of millions of dollars of shareholder wealth.

4. Since the truth began to emerge in early 2016, the Company has been required to restate its financial from 2011 through 2015—i.e., its entire history as a publicly-traded company. It has had to demote several of its most senior officers, including the Chairman of its Board of Directors and its Chief Financial Officer ("CFO"). Its independent outside auditors have refused to renew their engagement. The Company has declared that its financial statements contain material weaknesses in internal controls, and cannot be relied upon. Numerous statements have had to be delayed, forcing the Nasdaq national market on which FNBC stock trades to send suspension and de-listing notices. FNBC's primary regulators— including the Federal Reserve Bank, the Federal Deposit Insurance Corporation, and the Louisiana Office of Financial Institutions—have investigated the Company and recently have compelled it to enter into a draconian Consent Order requiring sweeping remediation plans for nearly every aspect of its risk management, finance, and accounting functions. The Company has hemorrhaged time and money to address these problems, including the expenses to defend a federal securities class action which subjects it to yet more damages.

5. In sum, the Individual Defendants have exposed FNBC to massive harm, such that its ability to continue as a going concern has now been called into question. They must be held to account by the Company and its public shareholders.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) FNBC maintains its principal executive offices in this district; (b) one or more of the Defendants resides in this district; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this district; and (d) the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

8.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

9.     Plaintiff Smith is a current shareholder of FNBC and has continuously held Company common stock during the Relevant Period.

10.    Nominal Defendant FNBC is a bank holding company offering a wide

array of financial services in the Louisiana and Mississippi Gulf Coast areas. FNBC's primary asset is the stock of its wholly-owned banking subsidiary, First NBC Bank. FNBC's operations are carried out through First NBC Bank and various other subsidiaries. As of December 31, 2015, the Company had 39 branch offices. The Company is incorporated in Louisiana, with its principal place of business at 210 Baronne Street, New Orleans, Louisiana 70112. The Company's common stock is traded on the NASDAQ under the ticker symbol "FNBC." As of November 1, 2015, the Company had more than 19 million shares issued and outstanding.

11.     Defendant Ashton J. Ryan, Jr. ("Ryan") is FNBC's Chief Executive Officer ("CEO"), President, and a member of its Board of Directors, positions he has held since 2007. Ryan served as Chairman of the FNBC Board of Directors from 2007 until September 16, 2016, when he was replaced in that role by Shivan Govindan. For fiscal year 2014, Ryan received $1,467,078 in total compensation, including salary, bonus, and stock or stock option awards. The amount was $1,612,855 for 2015.

12.     Defendant Shivan Govindan ("Govindan") has served as a member of FNBC's Board of Directors since 2006, including since 2013 as Vice Chairman. On September 16, 2016, he was appointed Chairman of the Board.

13.     Defendant Joseph F. Toomy ("Toomy") has served as a member of FNBC's Board of Directors since 2006.

14.     Defendant William David Aaron Jr. ("Aaron") has served as a member

of FNBC's Board of Directors since 2014.

15.   William M. Carrouche ("Carrouche") has served as a member of FNBC's Board of Directors since 2006.

16.   Leander J. Foley III ("Foley") has served as a member of FNBC's Board of Directors since 2006.

17.   John Fenner French ("French") has served as a member of FNBC's Board of Directors since 2006.

18.   Leon L. Giorgio Jr. ("Giorgio") has served as a member of FNBC's Board of Directors since 2006.

19.   Lawrence Blake Jones ("Jones") has served as a member of FNBC's Board of Directors since 2006.

20.   Louis V. Lauricella ("Lauricella") has served as a member of FNBC's Board of Directors since 2007.

21.   Mark G. Merlo ("Merlo") has served as a member of FNBC's Board of Directors since 2011.

22.   Charles C. Teamer Sr. ("Teamer") has served as a member of FNBC's Board of Directors since 2009.

23.   Mary Beth Verdigets ("Verdigets") was FNBC's CFO and Executive Vice President during most of the Relevant Period.   On September 16, 2016, Verdigets was demoted from this position to serve in a newly-established position as Treasurer of FNBC.   She was replaced as CFO by Albert J. Richard III, previously FNBC's Chief Accounting Officer.

24.     Defendants identified in ¶¶ 11-23 are referred to herein as the "Individual Defendants."

25.     Defendants identified in ¶¶ 11-22 are referred to herein as the "Director Defendants."

## FACTUAL ALLEGATIONS[1]

### A.     FNBC Begins Life as a Publicly-Traded Community Bank

26.     FNBC began operation as First National Bank in May 2006, when it received its charter to begin operations from the Louisiana Office of Financial Institutions.  With substantial local support, and in the immediate aftermath of Hurricane Katrina, the Bank raised initial capital of $60 million from the local community, which set a record for the largest initial capital raised by a Louisiana chartered institution.

27.     In its early years, the Bank focused on being a community, relationship-centered bank.  To this day, the Company's website prominently features the ideals it was founded to promote, namely, "a community bank guided by the principals [sic] of stability and soundness, building long-term banking relationships, responsiveness to customer needs, high quality service and becoming an active participant, with credibility, in the communities it serves."

28.     After six years, the Bank, led by CEO Ryan, determined to become a public-traded company through an initial public offering ("IPO") of common stock. To that end, the Company filed a Form S-1 with the SEC on November 9, 2012

---

[1]     All emphasis in quoted materials herein has been added to the original.

8

which was declared effective by the SEC on May 9, 2013.

29.   On May 10, 2013, the Company priced the IPO at $24 per share and filed with the SEC its final Prospectus, which formed part of the Registration Statement through which the IPO would be conducted.

30.   The Registration Statement touted FNBC's financial strength, including total assets of $2.7 billion, net loans of $1.9 billion, total deposits of $2.3 billion, and shareholders' equity of $248.1 million as of December 31, 2012.  Recent results featured a nearly 50 percent increase in net interest income, to $74.8 million, based on "significant growth in average interest-earning assets."  The Registration Statement reiterated that FNBC's business model would "focus on a traditional, relationship-based, community bank structure guided by . . . disciplined risk management; responsive, high-quality service; focus on building long-term relationships; credibility within our communities; [and] creativity and efficiency."  Further, the Registration Statement emphasized the Individual Defendants' focus on risk management, assessment and testing of internal controls, and their engagement of an "experienced independent public accounting firm."

31.   In the IPO, FNBC sold 4,791,667 shares of its common stock to investors throughout the United States, thus beginning life as a publicly-traded company.

**B.   The Individual Defendants Direct FNBC to Grow, then Depend for its Profitability, based on the Income-Enhancing Effects of Highly Risky Tax Credits**

32.   Both before and after the IPO, FNBC's primary focus has been on

9

commercial real estate and commercial lending in the Louisiana, Mississippi, and Florida Panhandle coastal areas. The Company's lending activities place heavy emphasis on local construction, commercial real estate, and consumer real estate loans, particularly in the New Orleans metropolitan area. The Company's primary source of funding for its loans is deposits, which are invested in U.S. Government obligations, mortgage-backed securities, municipal securities, and corporate bonds.

33.    After the IPO, the Individual Defendants directed FNBC to pursue, with more aggressiveness each year, a financial strategy of investing heavily in tax credits. This strategy, which FNBC has followed almost alone among its many competitors, involves the Company deliberately choosing real estate loan investments that allow the lender to reduce its income tax obligations by a certain amount. The tax "credit" achieved thereby reduces the tax on income otherwise earned on the loan, such that net, after-tax income is higher.

34.    As the Company explained in its Form 10-Q publicly filed with the SEC for the quarter ended March 31, 2016:

**Investments in Tax Credit Entities**

As part of its Community Reinvestment Act responsibilities and due to their favorable economics, the Company invests in tax credit-motivated projects. These projects produce tax credits issued under Federal Low-Income Housing, Federal Historic Rehabilitation, and Federal New Markets Tax Credits (Federal NMTC) programs. The Company generates its returns on tax credit motivated projects through the receipt of federal, and if applicable, state tax credits as well as equity returns. The federal tax credits are recorded as an offset to the income tax provision in the year that they are earned under federal income tax law – over 10 to 15 years, beginning in the year in which rental activity commences for Federal Low-Income Housing credits, in the year of the issuance of the certificate of occupancy and the property

being placed into service for Federal Historic Rehabilitation credits, and over 7 years for Federal NMTC upon the investment of funds into the CDE. These credits, if not used in the tax return for the year of origination, can be carried forward for 20 years. The state credits are recorded in income when earned (usually when the project is placed in service) and sold to investors since the Company pays minimal state income taxes under Louisiana tax law.

35.     The chief benefit derived from such an investment is the opportunity to claim a federal or state tax credit.  In the case of a Federal Low-Income Housing tax credit ("LIHTC") investment, for example, the credit is earned over a 15-year period but is claimed over an accelerated 10-year time frame, beginning in the year the property is placed in service and as units are occupied.  Because qualifying investments result in decreased tax liability, the economic return is not subject to state or federal taxation.  Thus, the tax credits they generate are, on paper, more valuable than the same dollar amount of taxable income earned from an alternative investment.

36.     Investors in LIHTC properties are also able to shelter otherwise taxable income from both federal and state taxation through deductions for depreciation.  Additional state housing tax credits may be available in the states in which LIHTC properties are located, further enhancing investment returns.  Further, regulated depository institutions such as FNBC, which are subject to the requirements of the Community Reinvestment Act ("CRA"), may receive consideration for LIHTC investments in the determination of their CRA ratings.

37.     According to the Individual Defendants, as a result of tax-credit initiatives at FNBC, every $1 of pre-tax income is worth approximately $1.99 in net

income.  For example, in the Company's Form 10-K for the fiscal year 2014 (issued on March 31, 2015), the Individual Defendants disclosed how tax credit investing could nearly double FNBC's income as measured by Generally Accepted Accounting Principles ("GAAP").

38.    In that year, the Company's $28 million worth of income before taxes under GAAP was boosted into a bottom-line net income under GAAP of nearly **$56 million**:

### As of and for the Years Ended December 31,

| (In thousands, except per share data) | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Income before income taxes:** | | | |
| Income before income taxes (GAAP) | $28,613 | $21,160 | $21,885 |
| Income adjustment before income taxes related to the impact of tax credit related activities (Non-GAAP) | | | |
| Tax equivalent income associated with investment in federal tax credit programs(1) | 57,560 | 40,618 | 22,051 |
| Income before income taxes (Non-GAAP) | 86,173 | 61,778 | 43,936 |
| Income tax expense-adjusted (Non-GAAP)(2) | (30,584) | (20,867) | (14,486) |
| Net income (GAAP) | $55,589 | $40,911 | $29,450 |

39.    By the end of fiscal year 2014, FNBC had $140.9 million in tax credit investments, including Federal New Markets Tax Credits, Low-Income Housing Tax Credits, Federal Historic Rehabilitation Tax Credits, and State New Markets Tax Credits.

40.    The Individual Defendants' pursuit of the tax-credit investment strategy for FNBC carried with it substantial risks.  First, tax credits are only offered by the federal or state governments on selected projects, viewed as socially desirable without regard to their financial risk/reward profile.  Second, the projects

themselves – which serve as the collateral securing the investments – are often illiquid, requiring the Company to remain invested for set time periods (sometimes up to 15 years) regardless of deteriorating project fundamentals.   Third, FNBC typically conducts its investments by acquiring large (up to 99 percent) economic interests in tax-credit entities, typically limited liability companies; however, the Company lacks any voting, financial, or managerial control over the entities.   In other words, the Company is entirely dependent on the competence and integrity of general partners in the projects over whom it has zero control.   Fourth, the strategy depends for its effectiveness on FNBC actually achieving some level of taxable income over the near term, since the tax credits, by their nature, can only shelter taxable income.   Fifth, because the highest tax credit effects occurs in the early years of projects, if the program as a whole is not carefully managed, FNBC will tempted to increase its investments in tax-credit projects each year, simply to maintain the prior year's level of tax credits.   Sixth, FNBC risks losing the tax credits if its investments cease to comply with applicable laws.

41.     During the Relevant Period, the Individual Defendants disregarded these risks and abdicated their responsibilities to exercise care or oversight over the Company's tax-credit investments, putting FNBC's financial stability as a whole at risk.   The Company's investments in tax-credit projects increased every year, as the Individual Defendants allowed FNBC to grow dependent on the early-year tax credits associated with the investments.   Worse, as the risks set forth above began to materialize, causing losses on the investments, the Individual Defendants did not

reduce but, rather, increased FNBC's exposure to the investments.

42.     As the Company began to bleed cash during the Relevant Period, the Individual Defendants simply doubled down on the enhanced accounting profits that the tax-credit investments would generate.  Bad money chased out the good, as FNBC became more and more dependent on tax credit benefits for its illusory profitability on paper.  The Individual Defendants rationalized their decision by boasting of their superior "understanding of tax credits," which "makes us the lender of choice for real estate projects in our markets [and] has enabled us to dominate this type of lending in New Orleans . . ."  (CEO Ryan's Letter to Shareholders, 2014 Annual Report, p. 8.)

43.     By the spring of 2016, the Individual Defendants could no longer ignore the realities of their disastrous mismanagement.  On February 1, 2016, the Company disclosed that its earnings for the fourth quarter of 2015 and fiscal 2015 as a whole had significantly underperformed analysts' expectations, based in substantial part on FNBC having been forced to book an $8.2 million tax credit impairment.  Just six weeks later, the Company was required to disclose that it had discovered errors in its account for Federal and State Historic Rehabilitation tax credit entities that could require the Company to restate its previously reported 2015 financial results.

44.     On April 8, 2016, FNBC announced that it would be forced to restate its consolidated financial statements for the fiscal years 2011, 2012, 2013, and 2014, together with interim quarterly periods during 2013, 2014, and 2015.  In addition,

shareholders were admonished that the Company's quarterly and annual financial statements from 2011 through 2015 could no longer be relied upon. In other words, results during FNBC's *entire reporting history* as a publicly traded company were a sham.

45.     Rather than come clean about their own abdication of responsibilities, the Individual Defendants blamed "an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities" and claimed that FNBC simply "had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities." The Individual Defendants stated that "[c]ontemporaneously with determining the ultimate impact to FNBC's financial statements, the Company is working to remediate the issues that caused the errors." Moreover, the Company was "assessing the impact of the identified errors on management's assessment of internal control over financial reporting for the year ended December 31, 2015."

## C.     The Individual Defendants Cause FNBC to Make Materially False and Misleading Statements during the Relevant Period

46.     Hiding the extent of their own mismanagement from shareholders formed an integral part of the Individual Defendants' misconduct. Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to the Individual Defendants and/or recklessly disregarded by them.

47.     On May 10, 2013, the first day of the Relevant Period, FNBC common

stock began trading on the NASDAQ. The Individual Defendants caused the Company to issue a press release that day which stated, in part, that "FNBC had assets of approximately $2.8 billion as of March 31, 2013."

48. On July 30, 2013, the Individual Defendants caused the Company to issue a press release announcing the Company's 2Q13 financial results for the interim period ended June 30, 2013. The Company reported net income of $8.6 million, or $0.48 diluted earnings per share ("EPS"), and total assets of $3.0 billion.

49. On August 14, 2013, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2013, which was signed and certified under the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Ashton and Verdigets. The 2Q13 10-Q reiterated the financial results reported on July 30, 2013. The 2Q13 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that the Company had disclosed any material changes to its internal control over financial reporting.

50. On November 7, 2013, the Individual Defendants caused the Company to issue a press release announcing its 3Q13 financial results for the interim period ended September 30, 2013. The Company reported net income of $10.4 million, or $0.54 diluted EPS, and total assets of $3.2 billion.

51. On November 14, 2013, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2013, which was signed and certified under SOX by defendants

16

Ashton and Verdigets.  The 3Q13 10-Q reiterated the financial results reported on November 7, 2013.  The 3Q13 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that the Company had disclosed any material changes to its internal control over financial reporting.

52.    On February 11, 2014, the Individual Defendants caused the Company to issue a press release announcing its 4Q13 and FY13 financial results for the periods ended December 31, 2013.   The Company reported net income of $13.5 million, or $0.69 diluted EPS, for 4Q13, and net income of $40.9 million, or $2.32 diluted EPS, and total assets of $3.3 billion for FY13.

53.    On March 31, 2014, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 31, 2013, which was executed on behalf of FNBC by each of the Individual Defendants, and certified under SOX by defendants Ashton and Verdigets.  The 2013 10-K reiterated the financial results reported on February 11, 2014.  The 2013 10-K further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

54.    On May 1, 2014, the Individual Defendants caused the Company to issue a press release announcing its 1Q14 financial results for the interim period ended March 31, 2014.  The Company reported net income of $12.8 million, or $0.66 diluted EPS, and total assets of $3.5 billion.

55.    On May 15, 2014, the Individual Defendants caused the Company to file

its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 1Q14 10-Q reiterated the financial results reported on May 1, 2014.  The 1Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

56.   On July 28, 2014, the Individual Defendants caused the Company to issue a press release announcing its 2Q14 financial results for the interim period ended June 30, 2014.  The Company reported net income of $12.7 million, or $0.65 diluted EPS, and total assets of $3.6 billion.

57.   On August 14, 2014, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 2Q14 10-Q reiterated the financial results reported on July 28, 2014. The 2Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

58.   On October 28, 2014, the Individual Defendants caused the Company to issue a press release announcing its 3Q14 financial results for the period ended September 30, 2014.  The Company reported net income of $14.4 million, or $0.73 diluted EPS, and total assets of $3.6 billion.

59.   On November 12, 2014, the Individual Defendants caused the Company

18

to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2014, which was signed and certified under SOX by defendants Ashton and Verdigets.  The 3Q14 10-Q reiterated the financial results reported on October 28, 2014.  The 3Q14 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

60.     On January 30, 2015, the Individual Defendants caused the Company to issue a press release announcing its 4Q14 and FY14 financial results for the periods ended December 31, 2014.   The Company reported net income of $15.7 million, or $0.80 diluted EPS, for 4Q14, and net income of $55.6 million, or $2.84 diluted EPS, and total assets of $3.8 billion for FY14.

61.     On February 18, 2015, the Company privately placed $60 million of its 5.75% Subordinated Notes due 2025 with certain qualified institutional investors, subject to the Company's promise to later register those notes for resale publicly.

62.     On March 31, 2015, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 31, 2014, which was executed on behalf of FNBC by each of the Individual Defendants, and certified under SOX by defendants Ashton and Verdigets.  The 2014 10-K reiterated the financial results reported on January 30, 2015.  The 2014 10-K further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

19

63.    On April 30, 2015, the Individual Defendants caused the Company to issue a press release announcing its 1Q15 financial results for the period ended March 31, 2015.   The Company reported net income of $16.0 million, or $0.82 diluted EPS, and total assets of $4.1 billion.

64.    On May 8, 2015, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 1Q15 10-Q reiterated the financial results reported on April 30, 2015.  The 1Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

65.    On August 11, 2015, FNBC filed an NT 10-Q, Notification of Late Filing, on Form 12b-25, which disclosed in pertinent part as follows:

> In connection with the preparation of its Form 10-Q for the quarter ended June 30, 2015, *the registrant identified errors in its accounting for certain of its investments in tax credit entities*. As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting for certain of its investments in tax credit entities, and for the registrant and its auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's evaluation of internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-Q.  The registrant expects to file its Form 10-Q within the extended time period prescribed under Exchange Act Rule 12b-25.

66.    On August 17, 2015, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015, which was signed and certified under SOX by defendants Ashton and

Verdigets.   The 2Q15 10-Q reported net income of $17.2 million, or $0.88 diluted EPS, and total assets of $4.1 billion for 2Q15.   The 2Q15 10-Q further attested that the financial results were accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

67.     On August 27, 2015, the Company conducted a registered exchange of its $60 million of 5.75% Subordinated Notes due 2025 privately placed in February 2015 with notes registered for resale under the federal securities laws.   The registered exchange offering was conducted pursuant to a registration statement filed with the SEC on Form S-4 on May 18, 2015, which had been amended several times based on comments received from the SEC and declared effective by the SEC on August 20, 2015.   The registration statement for the exchange offering expressly incorporated by reference the Company's 2014 10-K and its 1Q15 and 2Q15 Forms 10-Q.

68.     On November 2, 2015, the Individual Defendants caused the Company to issue a press release announcing its 3Q15 financial results for the interim period ended September 30, 2015.   The Company reported net income of $17.8 million, or $0.92 diluted EPS, and total revenue of $4.3 billion.

69.     On November 9, 2015, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015, which was signed and certified under SOX by defendants Ashton and Verdigets.   The 3Q15 10-Q reiterated the financial results reported on November 2, 2015.   The 3Q15 10-Q further attested that the financial results were

21

accurate and prepared in compliance with GAAP and that it disclosed any material changes to the Company's internal control over financial reporting.

**D.     Reasons the Individual Defendants' Statements were False and Misleading**

70.     The statements referenced in the previous section were each materially false and misleading when made, in that they failed to disclose and misrepresented the following adverse facts which were known to the Individual Defendants or recklessly disregarded by them:

(a)     That FNBC was improperly accounting for its Federal and State Historic Rehabilitation tax credit entities;

(b)     That the carrying value of FNBC's investments in tax credits on its books was overstated and that the Company should have marked those investments as impaired and taken charges against them much earlier;

(c)     That FNBC had not properly consolidated its variable interest entities related to Low-Income Housing Tax Credit entities;

(d)     That FNBC had a larger exposure to the oil and gas industry than it had disclosed during the Relevant Period;

(e)     That FNBC had failed to take adequate reserves against its growing oil and gas industry exposure;

(f)     That FNBC lacked effective internal and reporting controls; and

(g)     That the financial statements contained in FNBC's public filings with the SEC and other disclosures to shareholders had not been prepared

in accordance with GAAP and, therefore, were materially false and misleading.

**E.     The Truth Begins to Emerge**

71.     On February 1, 2016, FNBC issued a press release disclosing its 4Q15 and FY15 financial results. The Company reported net income of $15.8 million, or $0.82 diluted EPS, for 4Q15. For FY15, the Company reported net income of $67.3 million, or $3.44 diluted EPS, and total assets of $4.8 billion. The reported earnings significantly underperformed what the Individual Defendants had led shareholders to expect, based, in large part, on an $8.2 million tax credit impairment the Company disclosed it had been forced to take.

72.     In the press release, FNBC also began to more fully disclose the true extent of its exposure to the oil and gas industry. The Company disclosed that its direct exposure to the oil and gas industry had increased from September 30, 2015 to December 31, 2015 due in part to an exploration and production ("E&P") client drawing down a loan to complete new drilling for its main well. This increased the Company's exposure to energy-related loans by approximately $16 million quarter-over-quarter, entirely from the one large E&P loan that now totaled $90.2 million. This loan was 57 percent of the bank's energy exposure and had been downgraded by the bank's examiners back in 2Q15.

73.     The press release further disclosed that $39.7 million of a $69 million Company receivable related to ethanol production was past due. FNBC's energy loan exposure was also much larger, now at $158.4 million, or 4.5% of loans, and the

release was evasive as to whether the Company had taken adequate reserves on its oil and gas exposure.

74.     On this news, the price of FNBC common stock dropped $3.20 per share from its close of $30.40 per share on the evening of February 1, 2016 to close at $27.20 per share on February 2, 2016, a one-day decline of more than 10% on high trading volume.

75.     The February 1, 2016, press release was so contrary to shareholder expectations encouraged by the Individual Defendants that within ten days, the Company was obliged to issue a further public statement clarifying the earlier statements.  This clarification took the form of a Supplemental Information Sheet utilizing a "Question and Answer" format.

76.     The Supplemental Information Sheet, for the first time, disclosed how the Individual Defendants' improper accounting for, and failure to maintain internal controls over, tax credit investments had adversely affected its true net income.

77.     In pertinent part, the sheet posed and answered the following questions:

**The fourth quarter net income of $15.7 million is less than the $18.1 million reported for the linked third quarter.  What caused this and is it a trend?  Expenses seem to be very high in the fourth quarter and is this a trend?**

Both of these questions have the same answer, which is related to the Company's accounting change in the second quarter of 2015 related to tax credit investments.  Since inception, the Company had accounted for its tax credit investments using the cost method and had amortized that cost over its expected holding period for the investment.

24

This method resulted in consistent expense recognition from quarter to quarter and from year to year after giving effect to the growth in the Company's tax credit investment portfolio.  In June of 2015, the Company adopted the equity method of accounting for its historic tax credits as a preferable method of accounting for these investments.  As discussed in the Company's June 30, 2015 Form 10-Q, the cumulative effect of the change since the inception of our tax credit investments was immaterial and recognized in the second quarter.  The equity method does not utilize amortization (consistent write-off of the asset over a useful life) but rather impairment (recognized only as the investment is impaired, e.g. when it is probable that the investment balance will not be realized through future cash flow of the investment).  Under the equity method of accounting, some historic tax credit investments may not be impaired as long as they are held, while others may be written down to realizable value as impairment occurs.  This leads to uneven expense recognition from quarter to quarter as opposed to consistent amortization.

*With this background, the Company recognized no impairment with respect to its historic tax credit investments during the 3rd quarter of 2015*; in the fourth quarter, three such investments became impaired.  The impairment of $5 million, when combined with the costs associated with the State Investors Bank acquisition of $703,000, accounted for substantially all of the difference in profits between the fourth quarter and the third quarter.  Excluding impairment and acquisition costs, the Company's earnings increased $1.5 million, or 8%, from third to the fourth quarter of 2015 and $4.3 million, or 28%, from the fourth quarter of 2014.  *The adoption of the equity method of accounting is expected to continue to impact the results of operations of the Company in the following manner.*  First, the amount of impairment expense recognized by the Company may continue to be inconsistent from quarter to quarter.  Second, over the term of the investment, the Company expects to recognize less impairment expense than it would have recognized as amortization expense because the prior method resulted in the amortization of the entire investment.  Finally, substantially all of the impairment expense recognized by the Company is expected to continue to be associated with the structure of the tax credit investment, rather than changes in operations or economic conditions, as less than 1% of all historic tax credit investment projects are recaptured because of business failure.  Because substantially all of the impairment expense has been driven by the structure of the tax credit investment, *the Company plans to modify the structure of future investments so as to minimize the likelihood of*

*impairment, except in the case of changes in operations or economic conditions.* For so long as impairment remains a meaningful expense on the Company's Statement of Income, the Company intends to continue to present non-GAAP financial information adjusting for impairment and other expenses associated with the Company's investment in tax credit entities to enable investors to better understand the results of operations of the Company.

**Can the amount of historic tax credits generated in 2015 continue in 2016 and beyond?**

*In 2014, the Company began to disclose the tax credits for which it had finalized tax credit investments for each of the next 5 years.* The Company believed such a disclosure would provide investors with the ability to evaluate the continuity of its tax credit investment activity. *There is a time lag between the date the Company enters into a commitment to invest in a tax credit transaction and the date in which the credits are earned.* Two of the types of Federal tax credits in which the Company invests in are multi-year credits (New Markets - 7 years and Low Income Housing - 10 years) while the third (Historic) is earned when the renovation is placed in service. *The Company intended to again present the table of tax credits already contracted for, by estimated year of recognition, in its 2015 Form 10-K. However, in response to inquiries from analysts, the Company is providing the disclosure at this time.*

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Historic | $47,336,517 | $43,350,474 | $ 144,855 | $ — | $ — |
| New Market | 16,871,711 | 14,851,823 | 8,901,852 | 5,099,838 | 2,100,000 |
| Low Income Housing | 5,050,642 | 5,525,400 | 5,525,400 | 525,400 | 4,854,361 |
| TOTAL | $69,258,870 | $63,727,697 | $14,572,107 | $5,625,238 | $6,954,361 |

The table above is based on expected date the credits will be earned per the original project plan. Project timetables may accelerate or slip due to a variety of reasons, which can affect the period in which the credit is actually earned. Also, credits actually earned may be more or less than estimated credits due to cost overruns and underruns. Finally, *the schedule includes only projects under contract as of December 31, 2015, and each year the Company enters into contracts for projects that generate tax credits in the year of the*

*contract and in future years*; therefore, the later the year the higher the probability that the amounts shown above will be exceeded as the Company identifies and contracts additional transactions.

78.     The Supplemental Information Sheet also disclosed, for the first time,

the extent to which FNBC's exposure to the oil and gas industry had grown.

79.     The sheet stated as follows:

**Why did the amount of loans to exploration and production companies increase in the fourth quarter?**

In its 2014 Form 10-K, the Company discussed a large loan to one oil and gas exploration company which had encountered cash flow difficulties when a pipeline serving a well in its largest oil field broke, requiring the well to go off-line for a period of time. The break occurred on December 29, 2014 and caused the Company to reclassify all of the well's "proved producing reserves" to "proved undeveloped reserves" for purposes of the Company's reserve analysis as of December 31, 2014. The loss of cash flow from the well subsequently resulted in a reduction of the borrower's cash flow, and the Company's classification of the credit**. *In lieu of repairing the pipeline, which was expected to result in a resumption of production at its historical levels of 100-200 barrels per day, the borrower elected to drill a new well, which was expected to increase production capacity to 1,000-1,200 barrels per day. The Company agreed to finance the new well based on the enhanced revenue expected to be derived from it. The increase in the Company's loans to exploration and production companies during the third and fourth quarters was attributable solely to the increased balances of this borrower related to the drilling of the new well, which is now complete.*** Once connected to the pipeline, the production from the well is expected to substantially increase the borrower's cash flow, allowing for debt service and substantial debt reduction over the next five years. After considering the new well, together with a January 1, 2016 independent engineering valuation of the well's reserves, the Company's collateral position on the loan to this borrower conforms with the Company's loan policy, and the Company does not expect to recognize any loss with respect to this credit at current oil prices.

\* \* \*

27

**Give us more information regarding the investment in short-term receivables related to the ethanol company. Is this another example of oil and gas exposure in the Company's asset portfolio?**

The receivables from the ethanol company were purchased through The Receivables Exchange, a national exchange established to allow vendors to sell their customers' receivables to third party investors. Under the terms of the exchange contracts, the seller of the receivable is contractually committed to repurchase the receivable back from the seller if payment is not made by a specified repurchase date, subject to certain exceptions. Thus, the Company, as receivable purchaser, has two potential sources of repayment, the original issuer of the receivables (the ethanol company) or the seller and can choose to pursue either or both.

***The failure of the ethanol company to pay the invoices when due was the result of the financial difficulties of its parent, a Spanish "green" energy company with worldwide operations focused on expanding the use of solar power. This crisis caused U.S. suppliers of grain to the ethanol plants owned by the U.S. subsidiaries of the Spanish company to freeze credit to the ethanol plants for corn purchases, resulting in a shutdown 4 of the 6 ethanol plants owned by the U.S. subsidiaries of the Spanish company.*** Based on the Company's assessment of the strength of the ethanol industry and the historical earnings performance of the ethanol company and the receivables seller, the Company believes that both the ethanol company and the receivables seller are capable of repaying the full amount of the receivable balance over time. In addition, the parent corporation of the ethanol company is evaluating certain restructuring options that would permit a more prompt repayment of the receivable. As a result of the foregoing, management does not expect that the Company will incur any loss on its investment in short-term receivables related to the past due receivables discussed above. ***Finally, the receivable issued by the ethanol company represents 95% of the currently outstanding balance in the Company's investment in short term receivables.***

80.    The Supplemental Information Sheet further admitted that FNBC had never taken reserves against its growing exposure to the oil and gas industry and that it was suddenly taking an $11 million reserve against this exposure.

81.    The sheet stated as follows:


**Why didn't the Company disclose the amount of its loan loss reserve allocated to oil and gas credit exposure?**

*The Company has never disclosed the amount of its reserves allocated to any particular industry.*  After a review of the year-end disclosures of banks with significant oil and gas exposure, the Company has determined that such a disclosure may be valuable and will do so in the Company's 2015 Form 10-K.  As of December 31, 2015, the Company had no loans to its direct or indirect oil and gas customers which were classified as impaired and *thus had no specific reserves related to its oil and gas industry loans.* However, *in view of the substantial decline in oil prices, the Company has taken into account the exposure to the risk of loss in its portfolio within its ALLL methodology due to the oil and gas price decline and has allocated $11 million as of December 31, 2015.*

82.    On March 5, 2016, FNBC filed an NT 10-K, Notification of Late Filing,

on Form 12b-25 with the SEC, disclosing that the filing of the Company's Form 10-

K would have to be delayed:

In connection with the preparation of its Form 10-K for the year ended December 31, 2015, *the registrant identified errors in its accounting for its Federal and State Historic Rehabilitation tax credit entities and is evaluating the accounting for certain other matters.*  As a result of the time needed by the registrant to evaluate *the impact of the errors in its accounting and assessment of internal control over financial reporting*, and for the registrant's auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-K.

The registrant issued a preliminary earnings release on February 1, 2016 for the quarter ended December 31, 2015. The registrant has determined that *the estimates of noninterest expense and income tax benefit contained in this preliminary release will likely be increased, and net income will likely be reduced*, from the amounts reported for 2015. The registrant is still trying to evaluate

and determine the amount of the adjustments and the impact, if any, to the fourth quarter of 2015, prior quarters of 2015, or prior years. As a result, ***the information contained in the preliminary earnings release should not be relied upon pending the filing of Form 10-K.***

83.    As a result of this news, the price of FNBC common stock dropped $5.33 per share, to close at $19.09 per share on March 16, 2016—a one-day decline of nearly 22 percent on extremely high trading volume.

84.    Following the market close on April 8, 2016, FNBC publicly filed a Form 8-K with the SEC announcing that its financial statements for the years 2011, 2012, 2013, and 2014—as well as each of the interim periods within the years 2013, 2014, and 2015—would have to be restated and could no longer be relied upon. Similarly, press releases and earnings releases, as well as management's report on the effectiveness of internal control over financial reporting for 2013 and 2014, could no longer be relied upon.   In other words, the entirety of FNBC's financial reports as a publicly-traded company had been compromised.

85.    Moreover, the Company disclosed that faulty tax-credit accounting and controls were to blame for the restatement:

> The Company's management determined that the financial statements referred to above should be restated due to an error in the Company's methodology for the recognition of impairment of its investment in tax credit entities and the Company had not properly consolidated variable interest entities related to Low-Income Housing Tax Credit entities. The Company is continuing to review and quantify these and other potentially other less significant matters, which are expected to be reflected in the restated financial statements.

86.    The Company also attached a press release it had issued that evening to the Form 8-K, entitled "First NBC Receives Expected Notification of Deficiency

from NASDAQ Related to Delay in Filing 2015 Form 10-K," stating in pertinent part as follows:

> First NBC Bank Holding Company ("First NBC") (NASDAQ: FNBC), the holding company for First NBC Bank, announced today that it received a notification from the Nasdaq Stock Market ("Nasdaq") informing First NBC that, because it had not timely filed its Annual Report on Form 10-K for the year ended December 31, 2015, it was not in compliance with Nasdaq Listing Rule 5250(c)(1). First NBC had previously disclosed in a filing made with the Securities and Exchange Commission on March 16, 2016 that its 2015 Form 10-K was not expected to be filed timely for the reasons described therein. The Nasdaq notification letter has no immediate effect on the listing or trading of First NBC's common stock on the Nasdaq Global Select Market.

> Under Nasdaq rules, First NBC has 60 calendar days from the date of the letter, or until June 3, 2016, to submit a plan to regain compliance. If its plan is accepted, First NBC may be eligible for a listing exception of up to 180 calendar days or until September 26, 2016 to regain compliance. If Nasdaq staff concludes that First NBC will be unable to cure the deficiency, or if First NBC determines not to submit the required materials or make the required representations, First NBC's common stock will be subject to delisting by Nasdaq.

> First NBC expects the audit of its 2015 consolidated financial statements to be completed, and its Annual Report on Form 10-K for the year ended December 31, 2015 to be filed, within the compliance period established by Nasdaq.

87. As a result of this news, the price of FNBC common stock declined $0.47 per share to close at $18.65 per share on the next trading day, April 11, 2016—a decline of 2 percent on high trading volume.

88. On May 17, 2016 and August 17, 2016, FNBC publicly filed Forms 8-K with the SEC disclosing that it had received Notices from the Nasdaq Stock Market LLC ("Nasdaq") stating that the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1) because it had not timely filed its quarterly reports on Form

10-Q for the period ended March 31, 2016 and the period ended June 30, 2016, respectively.

89.    Similarly, on August 15, 2016, FNBC issued a press release announcing the delay of the filing of its 2015 Form 10-K and the extension of a previous deadline under its Nasdaq compliance plan for filing the 2015 Form 10-K. In response, FNBC submitted a plan to regain compliance with the Nasdaq's listing rules through the filing of its past due quarterly reports.  This plan was accepted by Nasdaq.

90.    On August 25, 2016, the Company filed its annual report on Form 10-K with the SEC.  The Form 10-K disclosed that FNBC's independent auditors, Ernst & Young LLP ("E&Y") had issued a report containing an adverse opinion on the effectiveness of FNBC's internal control over financial reporting as a consequence of widespread material weaknesses in control procedures.

91.    The material weaknesses at FNBC included "ineffective control environment and risk assessment, monitoring of credit to borrowers and investments in short-term receivables, accounting for investment in tax credit entities, identification and evaluation of variable interest entities and consolidation of variable interest entities, accounting for business combinations and review of journal entries."

92.    With regard to accounting for tax-credit investments, in Item 9A of the Form 10-K, the Company indicated that a shortage of competent personnel lay at the root of the problem.  FNBC stated as follows:

**Accounting for Investment in Tax Credit Entities**

The Company identified ***a material weakness related to the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities and the related evaluation of impairment***, if any, associated with these investments.  This material weakness resulted in material errors in the amount of impairment recorded, which led the Company to record additional adjustments to the financial statements for all periods presented in this Annual Report on Form 10-K.

93.     Further, the Company disclosed that it was unable, even now, to remediate the material weaknesses "until the necessary controls have been implemented and we have determined the controls to be operating effectively."

94.     On September 2, 2016, FNBC filed a Form 8-K with the SEC disclosing that E&Y had declined to stand for re-appointment as the independent auditors of the Company's financial statements for the year ending December 31, 2016, and the effectiveness of the Company's internal control over financial reporting for the same period.

95.     On September 16, 2016, FNBC filed a Form 8-K with the SEC disclosing that Defendant Ryan had been removed as Chairman of the Board of Directors and replaced in that role by Defendant Govindan.  In addition, Defendant Verdigets was removed as CFO and replaced by Albert J. Richard III, whose base salary compensation was increased to $345,000.  Defendant Verdigets was demoted to the role of Treasurer.  The Company also announced that the date of its annual meeting of shareholders had been set as of November 17, 2016—more than 30

calendar days from the first anniversary of the previous shareholder meeting.  This necessitated setting a new deadline for the submission of shareholder proposals.

96.    On October 3, 2016, FNBC filed a Form 8-K with the SEC disclosing that, as of September 28, 2016, the Company had received a Notice from Nasdaq stating that it was not in compliance with its previously-agreed timetable to file quarterly reports on Form 10-Q for the first and second quarters of 2016.  This made FNBC common stock subject to suspension from trading on the Nasdaq on October 7, 2016.  The Company stated that it intended to request a hearing before the Nasdaq which would automatically stay the delisting process for 15 days.

97.    On September 10, 2016, FNBC announced that it was unable to file its Form 10-Q for the third quarter in a timely fashion due to the resignation of its previous auditors, E&Y.

98.    On October 20, 2016, FNBC publicly filed its Form 10-Q for the third quarter of 2016.  In this report, the Company disclosed that it had been informed by the Federal Reserve Bank and the Louisiana Office of Financial Institutions ("OFI") that it had been deemed to be in "troubled condition" under the relevant banking regulations.

99.    As a result of this news, the price of FNBC common stock declined from approximately $11.20 per share on October 20, 2016 to $5.45 per share on October 25, 2016.  This was a drop of over 50 percent on the highest trading volume in over a year.

100.   On November 17, 2016, the Company filed a Form 8-K with the SEC

disclosing that it had entered into a Consent Order with the Federal Deposit Insurance Corporation ("FDIC") and the OFI.  The Consent Order requires FNBC to take certain actions, including:

- ▪ "review the Bank's management, its loan review and problem loan identification processes, and its loan portfolio policy and procedures; formulate a strategic plan (including a plan to sustain adequate liquidity), a plan to reduce classified assets, a capital plan to meet and maintain certain minimum capital levels, and a profit and budget plan; enhance internal controls; and hold additional on-balance sheet liquidity";

- ▪ "enhance its on-balance sheet liquidity on a near-term basis to achieve certain progressively higher benchmarks, including as a percentage of total deposits and total liabilities"; and

- ▪ "submit a plan to achieve and maintain a Tier 1 Leverage Capital ratio equal to or greater than 10 percent of the Bank's Average Total Assets, a Tier 1 Risk-Based Capital ratio equal to or greater than 13 percent of the Bank's Total Risk-Weighted Assets, and a Total Risk-Based Capital ratio equal to or greater than 15 percent of the Bank's Total Risk Weighted Assets."

101. The Consent Order indicates that, under the Individual Defendants management and control, FNBC has been transformed from a profitable community banking chain based on sound principles into a "troubled" institution whose future

35

as a going concern has been cast in serious doubt.  Indeed, in the same filing, FNBC disclosed that it had had to retain the services of two investment banks to explore "all strategic options" to advance the interests of the Company and its shareholders.

102.   As a result of the Individual Defendants' false statements and failures to exercise adequate oversight over accounting and internal controls during the Relevant Period, FNBC common stock traded at artificially inflated prices during the Relevant Period.  The revelations of the Individual Defendants' misconduct have caused the stock price and market capitalization of the Company to be cut in six. Indeed, since a Relevant Period high of $42.19 in November 2015 to approximately $8.45 currently, the stock price has declined by approximately *80 percent*.   In the process, the public shareholders of FNBC have lost immense wealth.

## F.   Certain Defendants Sell their Personal Holdings of Company Stock at Prices Inflated by their own Misstatements and Omissions

103.   Not all shareholders were harmed by the Individual Defendants' actions.  Indeed, some of the Individual Defendants made illegal use of their insider knowledge of the false and misleading statements about the Company's business and prospects.

104.   Specifically, during the Relevant Period, while in possession of material, adverse, non-public information, Defendants French and Govindan engaged in insider selling, collectively disposing of large amounts of their FNBC stock, for close to $1 million.

105.   In particular, French sold the following FNBC shares:

▪ 3,500 shares at an average price of $32.60, for proceeds of $114,100 on

36

February 19, 2015;

- 10,000 shares at an average price of $32.79, for proceeds of $327,892 on March 2, 2015; and

- 4,000 shares at an average price of $33.63, for proceeds of $134,520 on March 13, 2015.

106.   Govindan sold 8,000 shares on September 10, 2014, at an average price of $33.56, for proceeds of $268,480.

107.   French and Govindan had a duty not to sell shares while in possession of material, adverse non-public information concerning FNBC's business, finances, and prospects.  To do so would misappropriate the Company's material non-public information for their own benefit.  French and Govindan violated this duty.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

108.   By reason of their positions as officers, directors, and/or fiduciaries of FNBC and because of their ability to control the business and corporate affairs of FNBC, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FNBC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of FNBC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

109.   Each director and officer of the Company owes to FNBC and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

110.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of FNBC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with FNBC, each of the Individual Defendants had knowledge of material non-public information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

111.   To discharge their duties, the officers and directors of FNBC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of FNBC were required to, among other things:

    a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable

federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## B.   Audit Committee Duties

112.   In addition to these duties, the members of the Audit Committee owed specific duties to FNBC under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

113.   Specifically, according to FNBC's Audit Committee Charter, the Audit Committee is responsible for assisting the Board of Directors in fulfilling their oversight responsibilities to shareholders in the following areas, among others:

- the quality and integrity of the Company's financial statements and financial reporting process;

- the adequacy and effectiveness of the Company's internal controls and procedures for financial reporting, as well as its disclosure controls and procedures;

- the effectiveness of management's process to monitor and manage key business risks facing the Company; and

- the Company's compliance with ethics policies and legal and regulatory requirements.

114.   The Audit Committee Charter requires the Audit Committee members

39

to review and discuss with management specific areas of compliance concerning:

- Significant accounting and reporting issues, including complex or unusual transactions and highly judgmental areas, and recent professional and regulatory pronouncements, and understand their impact on the financial statements.

- The results of the annual external audit, quarterly reviews, and any other matters required to be communicated to the Committee, including any difficulties encountered by the independent auditors (and management's response). Some examples are any restrictions on the scope of the independent auditors' activities or on access to requested information, and any significant disagreements with management.

- The annual audited financial statements and quarterly financial statements (including Management's Discussion and Analysis of Financial Condition and Results of Operations) prior to the filing or distribution of the reports containing the financial statements. They will also consider whether they are complete, consistent with information known to Committee members, and reflect appropriate accounting principles.

- All matters required to be communicated to the Committee under generally accepted auditing standards.

- Understand how management develops interim financial information, and the nature and extent of internal and external auditor involvement.

- The annual proxy statement, including the report of the Committee to be included in the proxy statement.

- Earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the reconciliation of pro-forma and other non-GAAP financial information included in the press release to be presented under generally accepted accounting principles.

- Significant audit adjustments including those proposed adjustments that the independent auditors subsequently passed on.

- Any consultations on significant auditing or accounting issues regarding the Company, between the audit team and the audit firm's national office; any disagreements between the audit team and the audit firm's national office; the management letter.

- Critical accounting policies and financial statement presentations, including significant changes in the Company's selection or application of

40

accounting policies.

- Major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- The effect of new accounting initiatives on the financial statements.

- Unexpected events having a significant impact on financial results.

115.   Additionally, per the Audit Committee Charter, the Committee promised that it "**will**":

- Identify areas of risk and develop an annual audit plan to test and evaluate controls in those areas.

- Review and approve the scopes of all internal audits set by the Manager of Internal Audit or by the contracted audit service provider.

- Annually prepare a performance evaluation and approve the compensation for the Manager of Internal Audit.

- Receive direct reports from the loan review function as well as contracted internal audit services.

- Affirm the independence of the Internal Audit Department annually.

- Review the performance of internal audit on an annual basis including operational plans, staffing levels, and coordination of activities with the independent auditors.

- Review and approve the scope and work of contracted internal audit services.

- Ensure there are no unjustified restrictions or limitations placed on the Chief Compliance Officer, Internal Auditors, and all independent audit service providers.

- Meet with internal audit after audits are completed to discuss the results of audits together with management's responses.

- Review the overall adequacy and effectiveness of the internal audit function and internal controls based on the results of the annual internal audit program.

- Receive reports from the Manager of Internal Audit of any significant

changes to or issues identified with the internal control environment.

116.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

117.   Defendants Jones, Toomy, Govindan, and Foley sat on the Audit Committee during the Relevant Period.  By accepting appointments to serve on the Audit Committee, these Defendants undertook to fulfill the requirements of its charter in good faith.

118.   The events that have transpired, as alleged herein, demonstrate that the Defendants who sat on the Audit Committee breached their duty of good faith in failing, *inter alia*, to identify, maintain, and manage key areas of risk facing FNBC, to ensure the quality and integrity of the Company's financial reporting process, and to ensure the quality and integrity of the Company's internal controls and procedures for financial reporting (and disclosures of same to shareholders).

119.   Such failure prevented the good faith exercise of the Individual Defendants' oversight duties, and each of these defendants was aware that he or she was breaching his or her fiduciary duty.

## C.   Control, Access, and Authority

120.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of FNBC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as

the contents of the various public statements issued by FNBC.

121. Because of their advisory, executive, managerial, and directorial positions with FNBC, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of FNBC.

122. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of FNBC, and was at all times acting within the course and scope of such agency.

**D.    Reasonable and Prudent Supervision**

123. To discharge their duties, the officers and directors of FNBC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of FNBC were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)    remain informed as to how FNBC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)    refrain from trading on material, adverse, non-public information; and

(f)    ensure that FNBC was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

124.   The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and directors of FNBC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

125.   The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, shareholders and artificially inflating and maintaining the market price

of FNBC's securities by making untrue statements and omissions about FNBC's exposure to the risks from federal and state tax-credit investments, and exposure to risks from oil and gas exploration projects.

126.   The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action.  As a result of this and other breaches of fiduciary duties, FNBC has expended, and will continue to expend, significant sums of money.

127.   Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of FNBC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to FNBC.

128.   As directors and/or officers of FNBC, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known the adverse, non-public information about FNBC's business, operations, prospects, internal controls, and financials, including the Company's internal accounting and controls over federal and state tax-credit investments, because of their access to internal corporate documents, conversations and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.

129.   The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon FNBC through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and FNBC shareholders.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants aided and abetted and/or assisted each other in breaching their respective duties.

## DAMAGES TO FNBC

130.   As a result of the Individual Defendants' wrongful conduct, FNBC was caused to disseminate false and misleading statements and to omit material information to make such statements not false and misleading when made.   This misconduct has devastated FNBC's ability to adequately assess risk and maintain internal controls over financial accounting.   It has also devastated FNBC's credibility and creditworthiness with its own lenders.   Further, FNBC is the subject of the Securities Class Action, and has expended vast sums in an attempt to remediate the consequences of the Individual Defendants' misconduct, including the costs of internal investigations, restatements of financial results, negotiated delays with the Nasdaq in its listing status, retention of new auditors, responses to investigations by the Federal Reserve Bank, FDIC, and OFI, internal management reorganizations, and, as a last resort, the retention of multiple investment banks to

explore strategic alternatives.   FNBC has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

131.   As a direct and proximate result of the Individual Defendants' actions as alleged above, FNBC's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the misconduct described herein.

132.   Further, as a direct and proximate result of the Individual Defendants' conduct, FNBC has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

> (a) costs incurred in investigating and defending FNBC and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;
>
> (b) costs incurred in connection with cooperating with the Federal Reserve Bank, FDIC, and OFI investigations, plus potentially millions of dollars to resolve the investigations and any fines that result;
>
> (c) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on FNBC's artificially inflated stock price;
>
> (d) costs incurred from the misappropriation of Company information by the insider selling Defendants (French and Govindan) for the purpose of selling FNBC common stock at artificially inflated prices; and
>
> (e) costs incurred from the loss of the Company's customers' confidence in FNBC and its services.

133.   Moreover, these actions have irreparably damaged FNBC's corporate image and goodwill.  For at least the foreseeable future, FNBC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such

that FNBC's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered a loss of approximately *$650 million in market capitalization* as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE ALLEGATIONS

134.   Plaintiff also brings this action derivatively in the right and for the benefit of FNBC to redress injuries suffered, and to be suffered, by FNBC as a direct result of the breaches of fiduciary duty by the Individual Defendants.

135.   Plaintiff will fairly and adequately represent the interests of FNBC in prosecuting and enforcing its rights.  To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative and corporate governance litigation.

136.   Plaintiff is a shareholder of FNBC and has been a shareholder at all times relevant to the allegations set forth herein.

137.   In bringing this action, Plaintiff has satisfied all the governing statutory requirements of Article 615 of the Louisiana Code of Civil Procedure. First, Plaintiff has demonstrated his standing to bring this action as a shareholder during the Relevant Period.  Second, Plaintiff has joined the Company and the Individual Defendants against whom Plaintiff seeks to enforce the obligations at issue in this action.  Third, Plaintiff has included a prayer for judgment in favor of the Company and against the Individual Defendants.  Fourth, Plaintiff has agreed to submit a signed verification.

138.   In addition, pursuant to Louisiana Revised Statute Title 12 Section 1-742, prior to bringing this action, Plaintiff made a demand for remedial action on the Board of Directors of FNBC, including that the Board take suitable action to remedy the FNBC directors' and officers' breaches of fiduciary duty and obtain compensation from responsible parties for damages suffered by FNBC as a result of the above-described breached of fiduciary duty.  Plaintiff's demands were made by letter dated August 17, 2016 from his counsel to the FNBC Board of Directors (the "Demand Letter").  A Copy of the Demand Letter is attached hereto as Exhibit A.

139.   More than 90 days has passed since the Demand Letter was sent.  In that time, the FNBC Board of Directors has not taken suitable action to remedy the FNBC directors' and officers' breaches of fiduciary duty or to obtain compensation from the responsible parties for damages to FNBC from these breaches.  The FNBC Board has instead abdicated its responsibilities to investigate and preserve the Company's claims against those responsible for the wrongdoing and resulting harms to it as alleged herein.

140.   Thus, for all intents and purposes, the FNBC Board has refused to take the demanded actions in response to the Demand Letter.

141.   This refusal to act is wrongful, in that the refusal is not the product of an independent, good faith, and reasonable investigation of the matters set forth in the Demand Letter, and is not the product of a reasonably informed decision that refusal to act is in the best interests of the Company.

142.   Accordingly, Plaintiff has no adequate remedy at law and is forced to

bring this equitable action in the name and right of the Company to protects its interests and those of its shareholders.

143.  This action is not brought collusively to create jurisdiction that would not otherwise exist.

144.  FNBC is a publicly traded company with more than 19.2 million shares of Company common stock outstanding as of August 31, 2016.  Thus, the shareholders of FNBC are so numerous as to make it impracticable for all of them to join or be joined as parties.

## COUNT I

### Breach of Fiduciary Duties for Disseminating False and Misleading Information to Shareholders (Against All Individual Defendants)

145.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.  As alleged in detail herein, each of the Individual Defendants owed and owe FNBC and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision. These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

147.  In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false and misleading

public statements to shareholders that misrepresented and failed to disclose material information as set forth herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

148.   In direct violation of these duties, the Individual Defendants knowingly or recklessly caused FNBC to improperly account for and disclose tax-credit investments and oil and gas exploration exposure in violation of GAAP and the securities laws.

149.   As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, FNBC has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties for
### Failure To Maintain Internal Controls
### (Against All Individual Defendants)

151.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.   As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith to ensure that the Company maintained adequate internal controls.  When put on notice of problems with internal accounting for and internal controls over tax-credit investments and exposure to oil and gas

exploration risks, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

153.   In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with FNBC's internal control practices and procedures, and failed to make a good faith effort to correct the problems or their recurrence.   As directors and/or executive officers of FNBC, the Individual Defendants were responsible for authorizing, or failing to monitor, these internal control and accounting processes.   Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

154.   As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, FNBC has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

155.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties for
### Failure To Oversee and Manage the Company
### (Against All Individual Defendants)

156.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.   As alleged in detail herein, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other

employees to ensure that they conducted FNBC's affairs in conformity with all applicable laws and regulations, including laws and regulations governing acceptable accounting practices and acceptable disclosure practices.

158.   In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision and willfully or in bad faith allowed Company officers or other employees to conduct the Company's accounting, financial reporting, and internal audit and control functions, and in a manner that grievously harmed the best interests of the Company and its shareholders rather than protecting those interests.

159.   As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, FNBC has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.

160.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### (Against All Individual Defendants)

162.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of FNBC.

164.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to FNBC.

165.   Further, Defendants French and Govindan sold FNBC common stock while in possession of material, adverse non-public information concerning the Company, the concealment of which artificially inflated the price of the Company's stock at the time of their sales.  As a result, these Defendants profited from their misconduct and were unjustly enriched through their misappropriation and exploitation of material non-public information that belonged to the Company.

166.   Plaintiffs, as shareholders and representatives of FNBC, seek restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through or as a result of their wrongful conduct and fiduciary breaches.

167.   By reason of the foregoing, FNBC was damaged.

168.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### (Against All Individual Defendants)

169.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.   The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of FNBC's internal controls, by

issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

171.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against federal and state investigations and the Securities Class Action.

172.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

173.   By reason of the foregoing, FNBC was damaged.

174.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

### COUNT VI

**Breach of Fiduciary Duties for Insider Selling
and Misappropriation of Company Information
(Against Defendants French and Govindan)**

175.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.   At the time French and Govindan sold their FNBC stock, they were in

possession of material, nonpublic information concerning the Company, and they sold their stock on the basis of that information.

177.   The material, nonpublic information at issue—which concerned the Company's financial condition, future business prospects, exposure to risk from tax-credit investments and oil and gas exploration projects, compliance with GAAP, and the sufficiency of its Company's internal controls and accounting procedures—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms.  Instead, Defendants French and Govindan misappropriated this information entirely for their own benefit.

178.   At the time of their stock sales, these Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's exposure to risks from tax-credit and oil and gas exploration investments, and lack of internal controls.

179.   These Defendants' sales of stock while in possession and control of this material adverse, non-public information were breaches of their fiduciary duty of loyalty and good faith.

180.   Since the use of the Company's proprietary information for their own gain constitutes a breach of these Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that these Defendants obtained thereby.

181.   By reason of the foregoing, FNBC was damaged.

182.   Plaintiffs, on behalf of FNBC, have no adequate remedy at law.

## COUNT VII

### Violations of § 14(a) of the Exchange Act
### (Against the Director Defendants)

183.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

185.   FNBC's 2013, 2014, 2015, and 2016 Proxy Statements violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose the Company's true exposure to tax-credit investments and oil and gas exploration projects.  As a result of the foregoing, FNBC's public statements were materially false and misleading at all relevant times.

186.   In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxy Statements were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to election of directors, approval of officer

compensation, and appointment of independent auditor.

187.   The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   In favor of the Company and against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged herein;

B.   In favor of the Company and directing the Individual Defendants to take all necessary actions to reform and improve FNBC's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the integrity of the qualifications of FNBC directors, executives and other employees, including financial experts on the Audit Committee;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a provision charging the Board, a committee thereof, or a sub-committee thereof, to investigate, review, and recommend changes to the Company's core lending practices and its investment in tax-credit projects;

- a proposal to require an independent Risk Committee of the Board;

- a provision to permit the shareholders of FNBC to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

- a provision terminating Defendant Ryan as CEO and a director of FNBC for cause.

C.     Awarding to FNBC restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:    December 9, 2016.

Respectfully submitted,

O'BELL LAW FIRM, LLC

By:_____ /s/ Eric J. O'Bell_____
Eric J. O'Bell (#26693)
Bradley T. Oster (#35540)
3500 N. Hullen Street
Metairie, LA 70002
Tel.: (504) 456-8677
Fax: (504) 456-8653
ejo@OBellLawFirm.com

-and-

GLANCY PRONGY & MURRY LLP
Brian Murray
*Pro Hac Vice Anticipated*
*bmurray@glancylaw.com*
122 E. 42nd Street, Suite 2920
New York, NY  10168
Tel.: (212) 682-5340
Fax: (212) 884-0988

-and-

LAW OFFICES OF ALBERT M. MYERS,
LLC
Albert M. Myers
*Pro Hac Vice Anticipated*
*almyers@almyerslaw.com*
P.O. Box 1662
Decatur, GA 30031
Tel.: (404) 931-7735


*Counsel for Derivative Plaintiff*